http://www.va.gov/vetapp16/Files5/1639923.txt

Citation Nr: 1639923 
Decision Date: 09/30/16 Archive Date: 10/13/16

DOCKET NO. 11-34 086 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in San Diego, California

THE ISSUES

1. Entitlement to an effective date prior to August 14, 2012, for the award of service connection for coronary artery disease (CAD).

2. Entitlement to an initial rating in excess of 30 percent for CAD.

3. Propriety of the assignment of a temporary total rating for convalescence following a myocardial infarction from August 11, 2015, to November 30, 2015.

4. Entitlement to service connection for a right wrist disorder, to include gout and arthritis, to include as due to herbicide exposure and/or as secondary to service-connected right foot disorder. 

5. Entitlement to service connection for a right knee disorder, to include gout and arthritis, to include as due to herbicide exposure and/or as secondary to service-connected right foot disorder.

6. Entitlement to service connection for a left knee disorder, to include gout and arthritis, to include as due to herbicide exposure and/or as secondary to service-connected right foot disorder.

7. Entitlement to service connection for osteoarthritis other than of the right wrist and bilateral knees, to include as due to herbicide exposure and/or as secondary to service-connected right foot disorder.

8. Entitlement to service connection for a gastrointestinal (GI) disorder, to include as due to herbicide exposure and/or as secondary to service-connected right foot disorder.

9. Entitlement to service connection for ischemia/blood restriction of the legs, to include peripheral vascular disease (blood flow restriction disorder), to include as due to herbicide exposure and/or as secondary to service-connected CAD.

REPRESENTATION

Veteran represented by: California Department of Veterans Affairs

ATTORNEY FOR THE BOARD

Kate Sosna, Associate Counsel

INTRODUCTION

The Veteran served on active duty from November 1947 to March 1955 and from September 1955 to January 1971.

This matter comes before the Board of Veterans' Appeals (Board) on appeal from August 2010 (right wrist, bilateral knees, osteoarthritis other than in the right wrist and knees, and GI disorder) and June 2013 (blood flow restriction disorder and CAD) rating decisions issued by the Department of Veterans Affairs (VA) Regional Office (RO) in San Diego, California.

With respect to the characterization of the issues on appeal, the Board notes that the Veteran has claimed entitlement to service connection for ischemia/blood restriction of the legs. Upon review of the record, it is apparent that the Veteran has a diagnosis of peripheral vascular disease, a circulatory condition that causes pain to the legs. Therefore, in order to accurately reflect the nature of the Veteran's claim, the Board has characterized such issue as shown on the second page of this decision. See Brokowski v. Shinseki, 23 Vet. App. 79, 84 ("a claimant's identification of the benefit sought does not require any technical precision.") citing Ingram v. Nicholson, 21 Vet. App. 232, 256-57 (2007) ("It is the pro se claimant who knows what symptoms he is experiencing and that are causing him disability...[and] it is the Secretary who knows the provisions of title 38 and can evaluate whether there is a potential under the law to compensate an averred disability based on a sympathetic reading of the material in a pro se submission." (internal citations omitted)).

Similarly, while the Veteran did not specifically claim that his blood flow restriction disorder is secondary to his CAD, the Board is obligated to develop any reasonably raised theory of entitlement. See Schroeder v. West, 212 F.3d 1265, 1271 (Fed. Cir. 2000); Robinson v. Peake, 21 Vet. App. 545, at 552 (characterizing Schroeder as holding that "the duty to assist applies to the entire claim, which might require assistance in developing more than one theory in support of that claim"). As such, the Board has considered whether the Veteran's blood flow restriction disorder is secondary to his service-connected CAD. 

In January 2014 and July 2014, the Board remanded the claims for service connection for a right wrist disorder, a right knee disorder, a left knee disorder, osteoarthritis other than the right wrist and bilateral knees, and a GI disorder for further development. 

In July 2014, the Board also remanded the issues of entitlement to service connection for a blood flow restriction disorder, entitlement to an earlier effective date for the award of service connection for CAD, and entitlement to a higher initial rating for CAD for the issuance of a statement of the case (SOC) pursuant to Manlincon v. West, 12 Vet. App. 238 (1999). In September 2014, an SOC was issued and, as such, the Board finds that the Agency of Original Jurisdiction (AOJ) has substantially complied with the July 2014 remand orders with regard to these three claims and no further action is necessary in this regard. See D'Aries v. Peake, 22 Vet. App. 97, 105 (2008); Dyment v. West, 13 Vet. App. 141, 146-47 (1999) (remand not required under Stegall v. West, 11 Vet. App. 268 (1998), where the Board's remand instructions were substantially complied with), aff'd, Dyment v. Principi, 287 F.3d 1377 (2002). 
 
In an April 2016 rating decision, the RO assigned a temporary total rating for convalescence following a myocardial infarction from August 11, 2015, to November 30, 2015. The Veteran filed a notice of disagreement with this decision in July 2016. While an SOC has not been issued, the Board notes that the propriety of the length of the temporary total rating is part and parcel of the Veteran's increased rating claim. Therefore, such issue has been included on the title page of this decision.

This appeal has been processed utilizing the paperless, electronic Veterans Benefits Management System and Virtual VA claims processing systems. A review of the claims file reveals that additional documents were added to the claims file after the issuance of the June 2016 supplemental SOC. However, with the exception of a June 2016 Informal Hearing Presentation submitted by the Veteran's representative, the documents are irrelevant to the issues decided herein.

This appeal has been advanced on the Board's docket pursuant to 38 C.F.R. § 20.900(c) (2015). 38 U.S.C.A. § 7107(a)(2) (West 2014).

The issues of entitlement to service connection for a right wrist disorder, a right knee disorder, a left knee disorder, osteoarthritis other than of the right wrist and knees, a GI disorder, and blood flow restrictions are addressed in the REMAND portion of the decision below and are REMANDED to the AOJ.

FINDINGS OF FACT

1. The Veteran is presumed to have been exposed to herbicides coincident with his service in Vietnam.

2. The RO received the Veteran's original claim for service connection for a heart murmur in August 2008.

3. Service connection for a heart murmur was denied in a final March 2009 rating decision, which was continued in an April 2011 SOC, on the basis that there was no current disability for which service connection could be granted. 

4. The RO received the Veteran's original claim for service connection for a cardiovascular condition in May 2010.

5. Ischemic heart disease (IHD), including CAD, was added to the list of diseases presumed to be related to herbicide exposure effective August 31, 2010.

6. Service connection for a cardiovascular condition was denied in a final December 2010 rating decision on the basis that there was no current disability for which service connection could be granted.

7. In a December 2011 substantive appeal form regarding claims for service connection for a right wrist disorder, a right knee disorder, a left knee disorder, osteoarthritis other than in the right wrist and knees, and a GI disorder, the Veteran requested service connection for IHD. 

8. The earliest medical evidence confirming the presence of IHD, diagnosed as CAD, is dated on August 14, 2012.

9. In a June 2013 rating decision, presumptive service connection for CAD was granted with an effective date of August 14, 2012.

10. As of August 14, 2012, the Veteran's CAD was manifested by an ability to perform a workload of more than 7 to 10 METs (metabolic equivalent) with (at worst) dyspnea, fatigue, and angina; cardiac hypertrophy; cardiac dilatation; and left ejection fraction of (at worst) 60 percent, without evidence of chronic congestive heart failure.

11. Resolving all reasonable doubt in the Veteran's favor, he experienced a myocardial infarction on August 3, 2015.

CONCLUSIONS OF LAW

1. The criteria for an effective date prior to August 12, 2014, for the award of service connection for CAD, have not been met. 38 U.S.C.A. §§ 5107, 5110 (West 2014); 38 C.F.R. §§ 3.102, 3.114, 3.400, 3.816 (2015).

2. The criteria for an initial rating in excess of 30 percent for CAD have not been met. 38 U.S.C.A. §§ 1155, 5107 (West 2014); 38 C.F.R. §§ 3.102, 4.1-4.14, 4.104, Diagnostic Code (DC) 7005 (2015).

3. The criteria for a temporary total rating due to a myocardial infarction and three months convalescence from August 3, 2015, to November 30, 2015, are met. 
38 U.S.C.A. §§ 1155, 5107 (West 2014); 38 C.F.R. § 4.104, DC 7006 (2015).

REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

I. Due Process Considerations

The Veterans Claims Assistance Act of 2000 (VCAA), and implementing regulations, impose obligations on VA to provide claimants with notice and assistance. 38 U.S.C.A. §§ 5102, 5103, 5103A, 5107 (West 2014); 38 C.F.R. 
§§ 3.102, 3.156(a), 3.159, 3.326(a) (2015). Proper VCAA notice must inform the claimant of any information and evidence not of record that: (1) is necessary to substantiate the claim; (2) VA will seek to provide; and (3) the claimant is expected to provide. 38 U.S.C.A. § 5103(a); 38 C.F.R. § 3.159(b)(1). 

In Dingess/Hartman v. Nicholson, 19 Vet. App. 473 (2006), the United States Court of Appeals for Veterans Claims (Court) held that the VCAA notice requirements of 38 U.S.C.A. § 5103(a) and 38 C.F.R. § 3.159(b) apply to all five elements of a service connection claim. Those five elements include: 1) Veteran status; 2) existence of a disability; 3) a connection between the Veteran's service and the disability; 4) degree of disability; and 5) effective date of the disability. 
 
In Pelegrini v. Principi, 18 Vet. App. 112 (2004), the Court held that a VCAA notice, as required by 38 U.S.C.A. § 5103(a), must be provided to a claimant before the initial unfavorable AOJ decision on the claim for VA benefits. 

The Board observes that the Veteran has appealed with respect to the propriety of the initially assigned effective date and disability ratings for his CAD from the original grant of service connection. VA's General Counsel has held that no VCAA notice is required for such downstream issues. VAOPGCPREC 8-2003, 69 Fed. Reg. 25180 (May 5, 2004). In addition, the Board notes that the Court held that "the statutory scheme contemplates that once a decision awarding service connection, a disability rating, and an effective date has been made, § 5103(a) notice has served its purpose, and its application is no longer required because the claim has already been substantiated." Dingess v. Nicholson, 19 Vet. App. 473, 490 (2006). In this case, the Veteran's claim for service connection for his CAD was granted and an effective date and initial rating were assigned in the June 2013 rating decision on appeal. Therefore, as the Veteran has appealed with respect to the initially assigned effective date and disability rating, no additional 38 U.S.C.A. 
§ 5103(a) notice is required because the purpose that the notice is intended to serve has been fulfilled. Hartman v. Nicholson, 483 F.3d 1311 (Fed. Cir. 2007); Dunlap v. Nicholson, 21 Vet. App. 112 (2007). 

The VCAA also requires VA to make reasonable efforts to help a claimant obtain evidence necessary to substantiate his claim. 38 U.S.C.A. § 5103A; 38 C.F.R. § 3.159(c), (d). This "duty to assist" contemplates that VA will help a claimant obtain records relevant to his claim, whether or not the records are in Federal custody, and that VA will provide a medical examination or obtain an opinion when necessary to make a decision on the claim. 38 C.F.R. § 3.159(c)(4).

Relevant to the duty to assist, the Veteran's service treatment records as well as post-service VA and private treatment records have been obtained and considered. While the Veteran correctly noted in a May 2016 submission that one page is missing from private treatment records he submitted, the dates on the surrounding pages indicate that the missing page is from the period between August 3, 2015, to November 30, 2015, when, as granted below, the Veteran is already receiving the maximum benefit under the law. The Veteran does not contend and the record does not suggest that obtaining the missing page would reveal information that would entitle the Veteran to an increased rating for the period prior to or after his August 2015 myocardial infarction. Accordingly, the Board finds that remand for procurement of the missing page would serve no useful purpose. See Soyini v. Derwinski, 1 Vet. App. 540, 546 (1991) (strict adherence to requirements of the law does not dictate an unquestioning, blind adherence in the face of overwhelming evidence in support of the result in a particular case; such adherence would result in unnecessarily imposing additional burdens on VA with no benefit flowing to the appellant); Sabonis v. Brown, 6 Vet. App. 426, 430 (1994) (remands which would only result in unnecessarily imposing additional burdens on VA with no benefit flowing to the appellant are to be avoided). 

Additionally, the Veteran was afforded VA examinations for his CAD in May 2013 and May 2016, and an addendum to the May 2016 examination was obtained in June 2016. Neither the Veteran nor his representative has alleged that such are inadequate for rating purposes. Moreover, the Board finds that the examinations are adequate in order to evaluate the Veteran's service-connected CAD as they include interviews with the Veteran, a review of the record, and full physical examinations, addressing the relevant rating criteria. Moreover, the Veteran has not alleged that his CAD has increased in severity since the May 2016 VA examination. Palczewski v. Nicholson, 21 Vet. App. 174 (2007) (mere passage of time not a basis for requiring of new examination). Therefore, the Board finds that the examination reports of record are adequate to adjudicate the Veteran's initial rating claim and no further examination is necessary.

With regard to the Veteran's effective date claim, the Board notes that relevant medical evidence was reviewed by the AOJ in connection with the adjudication of the Veteran's service connection claim. However, pertinent to his effective date claim, as the Veteran has been assigned the earliest possible effective date under VA regulations, namely the date his CAD was diagnosed, and his arguments on appeal are limited to his interpretation of governing legal authority, all pertinent information and evidence is already contained in the claims file. There is no outstanding information or evidence that would help substantiate the Veteran's claim. 

As a final matter, the Board notes that the Veteran's claims for service connection for a right wrist disorder, a right knee disorder, a left knee disorder, osteoarthritis other than in the right wrist and bilateral knees, and a GI disorder were remanded in July 2014 for the procurement of outstanding records. To the extent that the procurement of such records can be seen as relevant to the claims decided herein, the Board notes that the AOJ has substantially complied with the Board's directives. See D'Aries, supra, Dyment, supra. In this regard, records were requested and obtained from a facility called Riverside in Moreno Valley and from David Grant Medical Facility on Travis Air Force Base (AFB) from 1971 to 1975. Additionally, while the Veteran did not provide an address for Lockheed Martin in the 21-4142 he submitted in April 2015, VA did send two requests for records to Lockheed Martin headquarters in Bethesda, Maryland. Furthermore, in April 2015 VA requested records from 1985 to 1995 from March AFB; in July 2015 the National Personnel Records Center (NPRC) indicated that the specific treatment facility at March AFB needed to be identified before the records could be located. Thereafter, VA sent the Veteran a letter and asked that he provide the requested information. The Veteran did not respond to that letter. See Wood v. Derwinski, 1 Vet. App. 190, 193 (1991) ("The duty to assist is not always a one-way street. If a Veteran wishes help, he cannot passively wait for it in those circumstances where he may or should have information that is essential in obtaining the putative evidence."). In August 2015, VA issued a letter notifying the Veteran of the attempts that had been made to obtain the records from March AFB and outlined why VA determined that further attempts to obtain the records would be futile. 

The Board recognizes the Veteran's April 2015 letter in which he opines that the records he had obtained from Travis AFB were incomplete and that these records and the March AFB records were damaged in a 1973 fire at the NPRC. However, there is no indication that the Veteran's records were damaged in the fire. In this regard, the responses received from the NPRC do not indicate that the Veteran's records were fire related. More telling, however, is that the Veteran has asserted that he received treatment at March AFB from 1985 to 1995 and any such records would post-date the 1973 fire. Given the foregoing, the Board finds that VA's attempts to obtain potentially relevant records have been exhaustive and that the duty to assist has been satisfied. See Soyini, supra, Sabonis, supra.

Thus, the Board finds that VA has fully satisfied the duty to assist. In the circumstances of this case, additional efforts to assist or notify the Veteran in accordance with the VCAA would serve no useful purpose. VA has satisfied its duty to inform and assist the Veteran at every stage in this case, at least insofar as any errors committed were not harmful to the essential fairness of the proceeding. Therefore, he will not be prejudiced as a result of the Board proceeding to the merits of his claims.

II. Earlier Effective Date Claim

By way of background, the Board notes that the Veteran is presumed to have been exposed to herbicides coincident with his service in Vietnam. On August 19, 2008, VA received the Veteran's original claim for service connection for a heart murmur. Thereafter, a March 2009 rating decision and an April 2011 SOC, in pertinent part, denied service connection for a heart murmur. Although a heart murmur was documented in service, the denial of service connection was based on a determination that no cardiac condition existed that was related to the in-service murmur. The Veteran subsequently failed to perfect an appeal as to such issue.

On May 21, 2010, while the claim for service connection for a heart murmur was still pending, the Veteran filed a claim for service connection for a cardiovascular condition. Subsequently, a December 2010 rating decision, in relevant part, denied service connection for a cardiovascular condition based on a determination that the Veteran did not have a cardiovascular condition. Notably, the RO based this decision, in part, on the findings from a November 2010 VA examination that failed to reveal any indication that the Veteran suffered from a current cardiac disability.

In a December 2011 substantive appeal form filed in conjunction with several of the claims currently on appeal, the Veteran noted that he suffered from ischemia, a disorder that was not currently being adjudicated by the RO. In a February 2012 letter, the RO asked the Veteran to clarify his intent in referencing ischemia on the substantive appeal form and in March 2012 the Veteran responded noting that the "[m]ention of ischemia and blood flow restriction was meant to be in support of [a claim for service connection for] presumptive ischemic heart disease..."

Thereafter, private medical records indicate that in July 2012 the Veteran reported experiencing chest pains and had abnormal cardiac testing. Based on said tests, the Veteran was referred to Dr. P.H. who saw the Veteran and reviewed his past medical history on August 13, 2012. Dr. P.H.'s initial impression was that the Veteran was experiencing chest pain. On the following day, August 14, 2012, cardiac catheterization and stents were accomplished, after which Dr. P.H. diagnosed the Veteran with CAD. Subsequent treatment records, including VA examination reports document the Veteran's continued diagnosis of and treatment for CAD.

Subsequently, a June 2013 rating decision granted service connection for CAD effective August 14, 2012, the date the Veteran was diagnosed with CAD. The Veteran has asserted that the heart murmur shown in service was, in essence, an early manifestation or a risk factor of his IHD and/or CAD, therefore warranting an earlier effective date for the grant of service connection for CAD from the date his original claim was submitted in August 2008. The Veteran has also argued that his in-service reports of gastrointestinal problems and chest pains were actually early manifestations of CAD and that, as such, an earlier effective date is warranted.

Unless specifically provided otherwise, the effective date for a grant of service connection is the day after separation from service or day entitlement arose, if a claim is received within one year of separation from service; otherwise, the date of receipt of claim, or the date entitlement arose, whichever is later. 38 U.S.C.A. 
§ 5110 (b)(1); 38 C.F.R. § 3.400 (b)(2)(i). 

If the award of compensation is due to a liberalizing change in the law or an administrative issue, the effective date of the award shall be fixed in accordance with the facts, but shall not be earlier than the date of the change in the law. See 38 U.S.C.A. § 5110(g); 38 C.F.R. §§ 3.400(p), 3.114(a). IHD, to include CAD, was added to the list of diseases subject to service connection on a presumptive basis effective August 31, 2010. 

There are exceptions to this rule, however, which allow for retroactive payments. If the claim is reviewed on the initiative of VA or by request of the Veteran/claimant within 1 year from the effective date of the law or VA issue, then the proper effective date is the same date the change of law went into effect. 38 C.F.R. 
§ 3.114(a)(1). If a claim is reviewed on the initiative of VA or by request of the Veteran/claimant more than one year after the effective date of the law, the effective date will be one year prior to the date of administrative review or Veteran/claimant request if the Veteran met all of the requirements for eligibility as of the date of the liberalizing law. 38 C.F.R. § 3.114(a)(2), (3). 

VA has promulgated special rules for the effective dates for the award of presumptive service connection based on exposure to herbicides, pursuant to orders of a United States District Court in the class action of Nehmer v. United States Department of Veterans Affairs. See Nehmer v. United States Veterans Administration, 712 F. Supp. 1404 (N.D. Cal. 1989) (Nehmer I); Nehmer v. United States Veterans Administration, 32 F. Supp. 2d. 1175 (N.D. Cal. 1999) (Nehmer II); Nehmer v. Veterans Administration of the Government of the United States, 284 F.3d 1158 (9th Cir. 2002) (Nehmer III).

If a Nehmer "class member" is entitled to a disability compensation for a "covered herbicide disease," the effective date of the award will be the later of the date such claim was (originally) received by VA or the date the disability arose. 38 C.F.R. 
§ 3.816(c)(1)-(2).

Specifically, a Nehmer "class member" is defined as a Vietnam Veteran who has a "covered herbicide disease." Id. The regulation as currently written defines a "covered herbicide disease" to include the diseases for which the Secretary of Veterans Affairs has established a presumption of service connection before October 1, 2002, pursuant to the Agent Orange Act of 1991. The new diseases added to the list of presumptive disabilities in August 31, 2010, which includes IHD, are not technically part of 38 C.F.R. § 3.816(b)(2). Id.; but see 75 Fed. Reg. 53, 202 (August 31, 2010). Notwithstanding the language of 38 C.F.R. § 3.816, however, notice accompanying the issuance of the final August 31, 2010, rule specifically notes the Nehmer provisions apply to the newly covered diseases. Id.

If the "class member" and "covered herbicide disease" requirements are met, then the effective date will be the later of (1) the date of claim stemming from the original denial; or (2) the date the disability arose. 38 C.F.R. § 3.816(c)(1)-(2). There are two exceptions to such rule: (1) if the class member's claim was received within one year from the date of the class member's separation from service, the effective date of the award shall be the day following the date of the class member's separation from active service and (2) if there was no prior claim (either previously denied or currently pending), then the effective date of the award shall be determined in accordance with the general effective date regulations (i.e., 38 C.F.R. §§ 3.114 and 3.400). 38 C.F.R. § 3.816(c)(3) & (4).

In the instant case, the Veteran served in Vietnam and has a diagnosis of IHD. Therefore, he is considered a Nehmer class member and, as such, the provisions of 38 C.F.R. § 3.816 are applicable. However, despite consideration of such provisions, the Board finds that the Veteran is not entitled to an effective date prior to August 14, 2012, for the award of service connection for CAD.

As an initial matter, the Board again observes that the Veteran filed a claim for service connection for a heart murmur on August 19, 2008, and that he asserts the effective date of his award of service connection for IHD should be this date. In this regard, a claim will be considered a claim for compensation for a particular covered herbicide disease if (i) the claimant's application and other supporting statements and submissions may reasonably be viewed, under the standards ordinarily governing compensation claims, as indicating an intent to apply for compensation for the covered herbicide disease or (ii) VA issued a decision on the claim, between May 3, 1989, and the effective date of the statute or regulation establishing a presumption of service connection for the covered disease, in which VA denied compensation for a disease that reasonably may be construed as the same covered herbicide disease for which compensation has been awarded.

The Board finds that the Veteran's August 2008 claim falls into the latter category as VA issued a decision denying compensation for a disease that reasonably may be construed as the same covered herbicide disease for which compensation has been awarded between May 3, 1989, and the effective date of the statute or regulation establishing a presumption of service connection for the covered disease (August 31, 2010). In such cases, 38 C.F.R. § 3.816(c)(2) provides that the effective date of the award will be the later of the date such claim was received by VA or the date the disability arose. Given that IHD is presumptively related to Nehmer Veterans' service, entitlement to service connection arises on the date of diagnosis of IHD. In this case, as discussed above, the Veteran was not diagnosed with IHD until August 14, 2012. Thus, the later of the date of claim, August 19, 2008, or the date entitlement arose, August 14, 2012, is the currently assigned effective date.
The Board acknowledges the Veteran's sincerely held belief that he suffered from IHD prior to the August 14, 2012, diagnosis. Specifically, he has claimed that his disability began during service as indicated by his documented heart murmur and reports of chest pain therein. However, the diagnosis of IHD involves a medical subject concerning an internal physical process extending beyond an immediately observable cause-and-effect relationship in that such requires knowledge of the cardiovascular system and the ability to read electrocardiogram and chest x-ray findings. Although lay persons are competent to provide opinions on some medical issues, see Kahana v. Shinseki, 24 Vet.App. 428, 435 (2011), as to the specific issue in this case, the presence of IHD, such falls outside the realm of common knowledge of a lay person. See Jandreau v. Nicholson, 492 F.3d 1372, 1377 n.4 (Fed. Cir. 2007) (lay persons not competent to diagnose cancer). Ultimately, the Board finds the opinion of the November 2010 VA examiner and the 2012 treatment records documenting the Veteran's CAD diagnosis to be significantly more probative than the Veteran's lay assertions as to the date his IHD manifested. 

Turning to the Veteran's May 21, 2010, claim for service connection for a cardiovascular condition, the Board notes that the Veteran's application and other supporting statements and submissions may reasonably be viewed, under the standards ordinarily governing compensation claims, as indicating an intent to apply for compensation for IHD. As the claim for compensation was pending before VA between May 3, 1989, and the effective date of the statute or regulation establishing a presumption of service connection for IHD, 38 C.F.R. § 3.816(c)(2) governs the effective date and provides that the effective date of the award will be the later of the date such claim was received by VA or the date the disability arose. As with the claim for service connection for a heart murmur, the later date between the Veteran's claim for service connection for a cardiovascular condition (May 21, 2010) and the date entitlement arose (August 14, 2012), is the date entitlement arose and the currently assigned effective date.

To the extent that the Veteran's arguments for an earlier effective date can be construed as allegations that his December 2011 claim for CAD can be construed as a claim to reopen previously denied claims, the effective date of reopened claims are governed under 38 C.F.R. § 3.400(q). Under 38 C.F.R. § 3.400(q)(1)(ii), the effective date based on new and material evidence other than service department records received after the final disallowance is the date of receipt of the new claim or the date entitlement arose, whichever is later. 

Regarding the August 2008 claim for a heart murmur, in a rating decision issued in March 2009, the RO denied the Veteran's claim for service connection. After being provided notice of the adverse decision and his appellate rights in March 2009, the Veteran entered a notice of disagreement in November 2009 and an SOC was issued in April 2011. However, no timely substantive appeal was received. As the Veteran did not submit a timely substantive appeal, and new and material evidence was not received prior to the expiration of the appeal period, such rating decision is final. See 38 U.S.C. § 7105(c) (2002); 38 C.F.R. §§ 3.104, 20.302, 20.1103 (2008). Thus, the effective date of the "reopened" claim would be the later of the December 27, 2011, claim for service connection for IHD or the date entitlement arose, August 14, 2012. Accordingly, an earlier effective date is also not warranted under this theory.

Similarly, in a December 8, 2010, rating decision the RO denied the Veteran's claim for service connection for a cardiovascular condition. He did not submit a notice of disagreement, and new and material evidence was not received within a year of the issuance of such decision. As such, the December 2010 rating decision is also considered final. See 38 U.S.C. § 7105(c) (2002); 38 C.F.R. §§ 3.104, 20.302, 20.1103 (2010). Thus, the effective date of the "reopened' claim would be the later of the December 27, 2011, claim for service connection for IHD or the date entitlement arose, August 14, 2012. Accordingly, an earlier effective date is also not warranted under this theory.

Finally, the Board notes that the Veteran's December 2011 claim for service connection for IHD was received more than a year after the August 31, 2010, effective date of the law authorizing presumptive service connection for IHD. However, as the Veteran did not meet all of the requirements for eligibility as of August 31, 2010, in that he did not have a diagnosis of IHD, an earlier effective date is also not warranted under 38 C.F.R. § 3.114. 

The Board recognizes the Veteran's argument that he should be assigned an effective date in 2008 as that is the year he filed a claim for service connection for a heart murmur. However, such argument is insufficient to establish that the Veteran is entitled to an earlier effective date under governing laws and regulations. The effective date of an award of service connection is assigned not based on the date the Veteran claims the disability appeared. As has been discussed in detail above, the effective date is the date of claim or the date entitlement arose, whichever date is later under both 38 C.F.R. § 3.816 and under 38 C.F.R. § 3.400. In this case, the Veteran was not entitled to compensation for CAD until August 14, 2012, because, despite his sincerely held belief to the contrary, he did not have a diagnosis of IHD prior to such date.

Therefore, based on the above-stated facts and regulations, the Board finds that the correct date for the grant of service connection for CAD is the date entitlement arose, August 14, 2012, which is later than the date of his August 19, 2008, May 21, 2010, and December 27, 2011, claims. As such, the Veteran is not entitled to an earlier effective date and his claim must be denied. 

III. Initial Rating Claim

Disability ratings are determined by applying the criteria set forth in the VA Schedule for Rating Disabilities, found in 38 C.F.R., Part 4. The rating schedule is primarily a guide in the evaluation of disability resulting from all types of diseases and injuries encountered as a result of or incident to military service. The ratings are intended to compensate, as far as can practicably be determined, the average impairment of earning capacity resulting from such diseases and injuries and their residual conditions in civilian occupations. 38 U.S.C.A. § 1155; 38 C.F.R. § 4.1. 
 
Where there is a question as to which of two evaluations shall be applied, the higher evaluation will be assigned if the disability picture more nearly approximates the criteria for that rating. Otherwise the lower rating will be assigned. 38 C.F.R. § 4.7. All benefit of the doubt will be resolved in the appellant's favor. 38 C.F.R. § 4.3.

Where the appeal arises from the original assignment of a disability evaluation following an award of service connection, the severity of the disability at issue is to be considered during the entire period from the initial assignment of the disability rating to the present time. See Fenderson v. West, 12 Vet. App. 119 (1999). Where the evidence contains factual findings that demonstrate distinct time periods in which the service-connected disability exhibits symptoms that would warrant different evaluations during the course of the appeal, the assignment of staged ratings is appropriate. Id.

In view of the number of atypical instances it is not expected, especially with the more fully described grades of disabilities, that all cases will show all the findings specified. Findings sufficiently characteristic to identify the disease and the disability therefrom, and above all, coordination of rating with impairment of function will, however, be expected in all instances. 38 C.F.R. § 4.21.

As noted above, when the Veteran was granted service connection for CAD, he was awarded a disability rating of 30 percent, effective August 14, 2012. In June 2016 he was also awarded a temporary total rating from August 11, 2015, to November 30, 2015, based on a myocardial infarction. However, the Veteran contends that his disability is more severe than is reflected in these disability ratings, and that his CAD should be rated at 100 percent since the effective date of service connection. 

Pertinent to the evaluation of heart disabilities, one MET (metabolic equivalent) is the energy cost of standing quietly at rest and represents an oxygen uptake of 3.5 milliliters per kilogram of body weight per minute. When the level of METs at which dyspnea, fatigue, angina, dizziness, or syncope develops is required for evaluation, and a laboratory determination of METs by exercise testing cannot be done for medical reasons, an estimation by a medical examiner of the level of activity (expressed in METs and supported by specific examples, such as slow stair climbing or shoveling snow) that results in dyspnea, fatigue, angina, dizziness, or syncope may be used. 

The Veteran's CAD is rated under DC 7005 pertaining to arteriosclerotic heart disease (CAD). Such provides a 30 percent disability rating when a workload of greater than 5 METs but not greater than 7 METs results in dyspnea, fatigue, angina, dizziness, or syncope, or evidence of cardiac hypertrophy or dilatation on electrocardiogram, echocardiogram, or X-ray. A 60 percent rating is warranted where there is more than one episode of acute congestive heart failure in the past year, or workload of greater than 3 METs but not greater than 5 METs results in dyspnea, fatigue, angina, dizziness, or syncope, or left ventricular dysfunction with an ejection fraction of 30 to 50 percent. A 100 percent rating is warranted where there is chronic congestive heart failure, or workload of 3 METs or less results in dyspnea, fatigue, angina, dizziness, or syncope, or left ventricular dysfunction with an ejection fraction of less than 30 percent.

From August 11, 2015, to November 30, 2015, the Veteran was assigned a total disability rating under DC 7006, for a myocardial infarction. Under such rating, a 100 percent disability rating is warranted during and for three months following a myocardial infarction, documented by laboratory tests. 38 C.F.R. § 4.104, DC 7006. The DC further provides that after the three month period, the Veteran's level of disability shall be based on the same factors listed under DC 7005 that are enumerated above.

A total rating (100 percent) will be assigned without regard to other provisions of the rating schedule when it is established that a service-connected disability has required hospital treatment in a Department of Veterans Affairs or an approved hospital for a period in excess of 21 days or hospital observation at Department of Veterans Affairs expense for a service-connected disability for a period in excess of 21 days. Subject to certain provisions, this increased rating will be effective the first day of continuous hospitalization and will be terminated effective the last day of the month of hospital discharge (regular discharge or release to non-bed care) or effective the last day of the month of termination of treatment or observation for the service-connected disability. Notwithstanding that hospital admission was for disability not connected with service, if during such hospitalization, hospital treatment for a service-connected disability is instituted and continued for a period in excess of 21 days, the increase to a total rating will be granted from the first day of such treatment. If service connection for the disability under treatment is granted after hospital admission, the rating will be from the first day of hospitalization if otherwise in order. 38 C.F.R. § 4.29.

Evidence relevant to the severity of the Veteran's CAD includes private treatment records and VA examination reports dated in May 2013 and May 2016. While the Veteran has also submitted several internet articles related to IHD, these articles merely discuss the fact that IHD is presumptively related to Agent Orange exposure and explain the criteria for separate ratings that are discussed above. They do not contain any information regarding the Veteran's personal level of disability and, as such, they are not relevant to the increased rating claim.

Private treatment records dated in August 2012 document the Veteran's reports of chest pain that occurred two to three times a week with exertion. He further reported that going up stairs left him feeling exhausted. He denied experiencing palpitations, syncope, or leg edema. Examination findings from the previous month documented that the Veteran's cardiovascular system had a regular rate and rhythm, 3/6 holosystolic murmur, no rubs or gallops, and brisk carotid upstrokes. Upon review of an echocardiogram, Dr. P.H. did not note evidence of cardiac atrophy or dilatation. Following the catheterization and stent placement surgery that occurred on August 14, 2012, Dr. P.H. diagnosed the Veteran with significant right coronary artery lesion status post percutaneous transluminal coronary angioplasty and stent placement and moderate left anterior descending CAD with normal left ventricular function. In the surgical notes Dr. P.H. noted left ejection fraction of 60 percent with no hypokinesis. The Veteran was discharged from the hospital the following day.

During the May 2013 VA examination, the examiner noted a 2012 diagnosis of CAD and indicated that the Veteran was taking continuous medication for such. The examiner noted the August 2012 stent placement and that there was no history of myocardial infarction, coronary bypass, heart transplant, pacemaker or the like. The examiner stated that the Veteran did not have congestive heart failure. The examiner reviewed the July 2012 stress test findings discussed above and indicated that the Veteran reported experiencing fatigue at greater than 7-10 METs, an activity level consistent with activities such as climbing stairs quickly, moderate bicycling, sawing wood, or jogging one mile in 10 minutes. The examiner also noted that at the time of the July 2012 private treatment, the Veteran's left ventricular ejection fraction was 74 percent. Diagnostic testing including EKG reports, chest x-rays, and an echocardiogram confirmed the presence of cardiac hypertrophy or dilatation. It was opined that the Veteran's CAD did not impact his ability to work.

In his November 2014 substantive appeal, the Veteran reported that, due to his CAD, he was unable to: do extensive walking or running; perform normal home chores (i.e. vacuuming and mopping); climb stairs without becoming exhausted; or perform normal yard work. 

Private treatment records dated in August 2015 (including those from Kaiser, Parkview, and Dr. P.H.) have been associated with the record. Notably, it appears that the Veteran was initially seen at Parkview and that, while some cardiac treatment and studies were performed there, the Veteran was awaiting transfer to Riverside Community Hospital where Dr. P.H. apparently had authority to see the Veteran. In this regard, the treatment records from Parkview indicate that on August 3, 2015, the Veteran experienced acute shortness of breath and was admitted to the hospital for suspected pneumonia. Chest x-rays were performed on August 5, 2015, and revealed that the heart was not enlarged. In what appears to be a treatment record from August 6, 2015, a physician noted that the Veteran presented with a "[s]omewhat technically difficult study" and noted the possible presence of atrial fibrillation. It was further noted that the left ventricle size was normal as was the wall thickness. Left ventricular systolic function was mildly impaired with an ejection fraction of 45 percent and the right ventricle was noted to be normal. Another chest x-ray on August 9, 2015, revealed an enlarged cardiac silhouette. On the date of discharge, a diagnosis of acute myocardial infarction was noted. 

Upon transfer to Dr. P.H.'s care at Riverside Community Hospital, Dr. P.H. noted that the Veteran had been doing well following the 2012 stent placements, but that on August 3, 2015, the Veteran experienced acute shortness of breath. When the Veteran was transferred to the care of Dr. P.H., he opined that the proceeding treatment indicated that the Veteran "went into acute heart failure for the last several weeks with cough, shortness of breath, elevated BNP..." He further indicated that the acute coronary heart failure and myocardial infarction was more or less resolved by the date of admission on August 11, 2015. An additional cardiac catheterization procedure was performed and the Veteran was discharged shortly thereafter. 

Then, in May 2016 the Veteran underwent a second VA cardiac examination. After reviewing the Veteran's records, the examiner noted a diagnosis of CAD in 2012 and a myocardial infarction and congestive heart failure in 2015. At the time of the examination, the Veteran was continuing to use daily medication. He was noted to have a mild aortic stenosis but he did not have an infectious heart condition, pericardial adhesions, cardiac hypertrophy, cardiac dilatation, or cardiac arrhythmia, to include atrial fibrillation. Upon physical examination, the Veteran was noted to have a regular heart rhythm, a systolic murmur, and normal peripheral pulses without edema of any extremity. As his previous heart procedures had been done via catheterization, there were no scars related to any of the Veteran's previous cardiac procedures. Imaging tests revealed sinus bradycardia with right ventricular conduction delay with non-specific wave change (noted to be insignificant), right lower lung granuloma, and left ventricular ejection fraction at 70 percent. An interview based METs test was performed and the Veteran reported experiencing dyspnea, fatigue, and angina at greater than 7-10 METS, a level that, again, is consistent with activities like climbing the stairs quickly, moderate bicycling, sawing wood, or jogging. The examiner opined that the Veteran's CAD impacted his ability to work because he would be unable to do physically strenuous work.

The Board notes that the examiner initially stated that the Veteran did not have chronic congestive heart failure. Thereafter, the examiner stated that the Veteran did have chronic congestive heart failure and erroneously noted a myocardial infarction in 2012 and 2015. Thereafter, in a June 2016 addendum, the examiner clarified her findings noting that the Veteran did not have chronic congestive heart failure as he had only experienced one episode of congestive heart failure and that occurred in 2015. 

Based on the foregoing, the Board finds that an initial rating in excess of 30 percent is not warranted at any time during the appeal period. The Board notes that a workload of 3 METs but no greater than 5 METs which results in dyspnea, fatigue, angina, dizziness, or syncope, or left ventricular dysfunction with an ejection fraction of 30 to 50 percent is required for a higher 60 percent evaluation under DC 7005. As above, both the May 2013 and May 2016 VA examination reports show workloads greater than 7 to 10 METs as well as left ventricular ejection fraction greater than 50 percent. Furthermore, while the Veteran had a left ejection fraction of 45 percent on August 6, 2015, he herein is assigned a 100 percent rating during such period based on his myocardial infarction. Furthermore, the 2016 examination report indicates that at that time, the Veteran did not have cardiac hypertrophy or dilatation. While the Veteran has credibly reported the inability to walk for prolonged distances or to do certain chores due to fatigue, such symptoms are contemplated by the currently assigned rating. As such, the Board finds that an increased rating is not warranted for the service-connected heart disability. 

The Board has considered whether a higher or separate rating is warranted under any other potentially applicable diagnostic code. Specifically, the Board notes that in conjunction with his hospitalization in August 2015, he was noted to be experiencing atrial fibrillation. Shortly thereafter, during the May 2016 examination the Veteran was no longer experiencing any cardiac arrhythmia. Accordingly, the Board finds that the evidence of record does not establish any additional cardiac diagnoses beyond the already compensated CAD and one time myocardial infarction discussed below.

Regarding the temporary total rating that was assigned for the Veteran's August 2015 myocardial infarction, the Board finds that upon a review of the evidence of record, a temporary total rating is warranted from August 3, 2015, to November 30, 2015. In this regard, DC 7006 clearly states that a Veteran shall be entitled to a 100 percent rating during and for three months after a myocardial infarction. Here, while it is unclear from the record on exactly what date in August 2015 the Veteran experienced a myocardial infarction, there is evidence that he was initially hospitalized for shortness of breath and that cardiac testing was performed. Additionally, his discharge diagnosis on August 11, 2015, noted an acute myocardial infarction and Dr. P.H. indicated that by the time he was admitted to his care, the Veteran's myocardial infarction had mostly resolved. Accordingly, resolving all doubt in the Veteran's favor, the Board finds that he experienced a myocardial infarction on August 3, 2015, and under DC 7006, he should be awarded a total rating for that date and the following three months.
However, the Board also finds that the Veteran is not entitled to a separate total evaluation based on his August 2012 catheterization surgery as the records clearly indicate that the Veteran did not experience a myocardial infarction on such occasion and he was admitted to non-VA facilities for less than 21 days. 38 C.F.R. §§ 4.104, 4.29.

In making its rating determinations above, the Board has also carefully considered the Veteran's contentions with respect to the nature of his service-connected CAD, and notes that his lay testimony is competent to describe certain symptoms associated with such disability. The Veteran's history and symptom reports have been considered, including as presented in the medical evidence discussed above, and have been contemplated by the disability rating that has been assigned. Moreover, the competent medical evidence offering detailed specific findings pertinent to the rating criteria is the most probative evidence with regard to evaluating the pertinent symptoms. As such, while the Board accepts the Veteran's testimony with regard to the matters he is competent to address, the Board relies upon the competent medical evidence with regard to the specialized evaluation of functional impairment, symptom severity, and details of clinical features of the service-connected CAD at issue. 

The Board has considered whether additional staged ratings under Fenderson, supra, are appropriate for the Veteran's service-connected CAD; however, the Board finds that his symptomatology has been stable throughout the appeal period, aside from the August 2015 myocardial infarction for which he has been granted a 100 percent disability rating. Therefore, assigning staged ratings for such disability is not warranted. 

The Board has also contemplated whether the case should be referred for consideration of an extra-schedular rating. An extra-schedular disability rating is warranted if the case presents such an exceptional or unusual disability picture with such related factors as marked interference with employment or frequent periods of hospitalization that application of the regular schedular standards would be impracticable. 38 C.F.R. § 3.321(b)(1). 

In Thun v. Peake, 22 Vet. App. 111, 115-16 (2008), the Court explained how the provisions of 38 C.F.R. § 3.321 are applied. Specifically, the Court stated that the determination of whether a claimant is entitled to an extra-schedular rating under 3.321 is a three-step inquiry. First, it must be determined whether the evidence presents such an exceptional disability picture that the available schedular evaluations for that service-connected disability are inadequate. In this regard, the Court indicated that there must be a comparison between the level of severity and symptomatology of the claimant's service-connected disability with the established criteria found in the rating schedule for that disability. Under the approach prescribed by VA, if the criteria reasonably describe the claimant's disability level and symptomatology, then the claimant's disability picture is contemplated by the rating schedule, the assigned schedular evaluation is, therefore, adequate, and no referral is required. 

Second, if the schedular evaluation does not contemplate the claimant's level of disability and symptomatology and is found inadequate, the RO or Board must determine whether the claimant's exceptional disability picture exhibits other related factors such as "marked interference with employment" and "frequent periods of hospitalization." Third, when an analysis of the first two steps reveals that the rating schedule is inadequate to evaluate a claimant's disability picture and that picture has attendant thereto related factors such as marked interference with employment or frequent periods of hospitalization, then the case must be referred to the Under Secretary for Benefits or the Director of the Compensation and Pension Service to determine whether, to accord justice, the claimant's disability picture requires the assignment of an extra-schedular rating. Id. 

In the instant case, the Board has carefully compared the level of severity and symptomatology of the Veteran's service-connected CAD with the established criteria found in the rating schedule. In this regard, the specific diagnostic criteria used to evaluate the cardiac disability reasonably describe the Veteran's disability level and symptomatology; thus, his disability picture is contemplated by the rating schedule, and the assigned schedular evaluation is, therefore, adequate. The rating criteria used specifically accounts for the Veteran's complaints of angina, dyspnea, and fatigue as well as the effect this symptomology has on the Veteran's life (via METs testing). Therefore, there are no additional symptoms of the Veteran's service-connected CAD that are not contemplated by the rating schedule to warrant an extra-schedular rating.

The Board notes that, pursuant to Johnson v. McDonald, 762 F.3d 1362 (Fed. Cir. 2014), a Veteran may be awarded an extra-schedular rating based upon the combined effect of multiple conditions in an exceptional circumstance where evaluation of the individual conditions fails to capture all the symptoms associated with service-connected disabilities experienced. 

However, in Yancy v. McDonald, 27 Vet. App. 484 (2016), the Court stated that "[n]othing in Johnson changes the long-standing principle that the issue of whether referral for extra-schedular consideration is warranted must be argued by the claimant or reasonably raised by the record." Id. at 495. The Court held that "the Board is required to address whether referral for extra-schedular consideration is warranted for a Veteran's disabilities on a collective basis only when that issue is argued by the claimant or reasonably raised by the record through evidence of the collective impact of the claimant's service-connected disabilities." Id., citing Thun v. Peake, 22 Vet. App. 111, 115 (2008); Robinson v. Nicholson, 21 Vet. App. 545, 552 (2008). 

In the instant case, while such issue has not been raised by the Veteran or the record, the Board finds that, even after affording the Veteran the benefit of the doubt, there is no additional impairment that has not been attributed to a specific, rated disability. Accordingly, this is not an exceptional circumstance in which extra-schedular consideration may be required to compensate the Veteran for disability that can be attributed only to the combined effect of multiple conditions.

Therefore, the Board finds that the rating criteria reasonably describe the Veteran's disability level and symptomatology associated with the service-connected CAD. As such, the Board need not proceed to consider the second factor, viz., whether there are attendant thereto related factors such as marked interference with employment or frequent periods of hospitalization. Consequently, the Board concludes that referral of this case for consideration of an extra-schedular rating is not warranted. Thun, supra; Bagwell v. Brown, 9 Vet. App. 337, 338-39 (1996); Floyd v. Brown, 9 Vet. App. 88, 96 (1996). 

In Rice v. Shinseki, 22 Vet. App. 447 (2009), the Court held that a claim for a total disability rating based on individual unemployability due to service-connected disabilities (TDIU) is part of an increased rating claim when such claim is expressly raised by the Veteran or reasonably raised by the record. In this case, the record does not reflect, and the Veteran does not allege, that he is unemployable due to his CAD. To the contrary, the Veteran has routinely reported that he stopped working due to his non-service connected GI disorder and the restrictions said disorder placed on his ability to lift and carry things. While the May 2015 VA examiner did state that the Veteran's CAD would impact his ability to work in that he would not be able to perform strenuous work, the record does not show that he is unemployable due to such disability. In this regard, his currently assigned schedular rating for his CAD specifically contemplate the impairment such disability has on his ability to work. Specifically, the basis of disability evaluations is the ability of the body as a whole, or of the psyche, or of a system or organ of the body to function under the ordinary conditions of daily life including employment. 38 C.F.R. § 4.10. Therefore, the Board finds that a TDIU is not raised by the Veteran or reasonably raised by the record in connection with his increased rating claim decided herein and, consequently, no further consideration of such is necessary at this time.

In sum, the Board finds that the preponderance of the evidence is against a rating in excess of 30 percent for the Veteran's CAD. The Board also finds that a temporary total evaluation is appropriate from August 3, 2015, but no earlier, through November 30, 2015. Therefore, the benefit of the doubt doctrine is not applicable except as has been applied to the temporary total rating assigned herein, and the Veteran's claim for an increased rating is otherwise denied. 38 U.S.C.A. § 5107; 38 C.F.R. §§ 4.3, 4.7.

ORDER

An effective date prior to August 14, 2012, for the grant of service connection for CAD is denied.

An initial rating in excess of 30 percent for CAD is denied.

A temporary total rating for convalescence following a myocardial infarction from August 3, 2015, to November 30, 2015, is granted, subject to the laws and regulations governing the payment of monetary benefits.

REMAND

Although the Board regrets the additional delay, a remand is again necessary to ensure that due process is followed and that there is a complete record upon which to decide Veteran's service connection claims so that he is afforded every possible consideration. In addition, where the remand orders of the Board are not complied with, the Board errs as a matter of law when it fails to ensure compliance. Stegall v. West, 11 Vet. App. 268, 271 (1998).

With regard to the Veteran's claims for service connection for a right wrist disorder, a right knee disorder, a left knee disorder, and osteoarthritis other than of the right wrist and bilateral knees, the Board remanded these claims in January 2014 and July 2014 in order to obtain etiological opinions. Specifically, in each remand the Board noted the Veteran's contentions that his right wrist problem began in service and that his general claim for service connection for osteoarthritis was related to prolonged sitting during service. The Board further noted that the service treatment records documented a right knee injury in May 1968 and that a January 2011 VA examiner did not offer an etiological opinion as to the diagnosed degenerative arthritic changes of the right wrist and bilateral knees. Thereafter, pursuant to the January 2014 remand directives, in March 2014 another VA examiner opined that the Veteran's claimed conditions were less likely than not incurred in or caused by the claimed in-service injury, event, or illness as his service treatment records contained no complaints of chronic back pain, right wrist pain or injury, or ongoing knee pain; no further rationale was provided. In the July 2014 decision the Board noted that the March 2014 examination was inadequate as the examiner relied on the absence of evidence of disability in the service treatment reports, and did not account for competent lay testimony as to continuity of symptoms. See Dalton v. Nicholson, 21 Vet. App. 23, 39-40 (2007). It was also observed that the 2014 examiner did not address whether the Veteran's claimed disorders were related to the prolonged sitting he did as a result of his military duties or his in-service exposure to herbicides, nor did she address whether osteoarthritis in any joint had manifested within one year of separation from service. 

As such, in the July 2014 remand the Board requested an opinion to address whether the right wrist, right knee, left knee, and/or osteoarthritis of areas other than the right wrist and knees: (a) onset within a year of service; (b) were related to the Veteran's service to include his exposure to herbicides therein, work therein, and/or medical treatment for his right knee therein; (c) were related to sitting for prolonged periods during his service; and/or (d) whether such disorders were caused or aggravated by the Veteran's service-connected right foot disorder. 

In September 2015 and February 2016 addendum opinions were provided by the March 2014 examiner in which she opined that it was less likely than not that the Veteran's osteoarthritis was related to his military service. Instead, she opined that the Veteran's age likely caused his current arthritis. However, the examiner failed to provide a rationale for said opinion and she failed to opine why the Veteran's in-service injuries, prolonged sitting, Agent Orange exposure, or gouty arthritis did not cause his musculoskeletal disorders. Moreover, while the examiner did note that it was unsurprising that the Veteran had arthritis given his advanced age, she failed to address the fact that the Veteran was diagnosed with arthritis and reported wrist pains well before the 2015 addendum opinion was provided. Therefore, an addendum opinion should again be obtained, preferably from a new examiner.

With regard to the Veteran's claim for service connection for a GI disorder, the Board also remanded this claim in January 2014 and July 2014 to obtain an etiological opinion. The Board noted the Veteran's in-service GI complaints and his various diagnosed GI disorders, including peptic ulcer disease, hiatal hernia, irritable bowel syndrome and GERD. The examiners were instructed to provide an etiological opinion for each diagnosed GI disorder, to include whether such disorder was related to the Veteran's in-service GI complaints or his in-service exposure to herbicides. As noted in the July 2014 remand, the opinion that was provided in March 2014 pursuant to the January 2014 remand was inadequate as the examiner failed to take into account relevant diagnoses that constituted the presence of a disability during the claim and failed to consider whether Agent Orange had caused the GI disorders on a non-presumptive basis.

Thus, pursuant to the July 2014 remand, the March 2014 examiner provided another addendum opinion in October 2015. While the examiner resolved prior conflicting statements regarding the presence of a disability and opined that it was less likely than not that the Veteran's GI disorder was related to service, she failed to provide a rationale for the opinion provided and failed to provide an opinion regarding any possible relationship between the Veteran's GI disorder and his Agent Orange exposure. Additionally, since that time the Veteran has also intimated that his arthritis medication may have caused his GI disorder. Given the foregoing, another opinion should be obtained, preferably from a new examiner.

Turning to the Veteran's claim for service connection for a blood flow restriction disorder, remand of this claim is also required to afford the Veteran an examination. In this regard, VA's duty to assist includes a duty to provide a medical examination or obtain a medical opinion where it is deemed necessary to make a decision on the claim. 38 U.S.C.A. § 5103A(d); 38 C.F.R. § 3.159(c)(4); Duenas v. Principi, 18 Vet. App. 512 (2004); Robinette v. Brown, 8 Vet. App. 69 (1995); McLendon v. Nicholson, 20 Vet. App. 79 (2006). In addition, once VA undertakes the effort to provide an examination when developing a service connection claim, even if not statutorily obligated to do so, it must provide an adequate one or, at a minimum, notify the claimant why one will not or cannot be provided. Barr v. Nicholson, 21 Vet. App. 303, 311 (2007). 

Here, the Veteran has claimed that his blood flow restriction disorder is related to prolonged sitting in service or his exposure to herbicides therein. As noted in the Introduction section above, the Board has expanded the Veteran's claim to include consideration of whether his service-connected CAD caused or aggravated his blood flow restriction disorder. Given the Veteran's current diagnosis, his presumed in-service exposure to herbicides, his service-connected CAD, and his credible reports of prolonged sitting in service, the Board finds that the low threshold of the McLendon standard has been met in this instance, and that the Veteran should be afforded a VA examination and opinion prior to adjudication of his claim. See McLendon, 20 Vet. App. at 81.

Accordingly, the case is REMANDED for the following action:

(Please note, this appeal has been advanced on the Board's docket pursuant to 38 C.F.R. § 20.900(c). Expedited handling is requested.)

1. Forward the Veteran's claims file, to include a copy of this remand, to a VA physician to obtain opinions concerning the nature and etiology of the Veteran's right wrist, bilateral knee, osteoarthritis other than of the right wrist and knees, and GI disorders. The need for another clinical examination is left to the discretion of the medical professional offering the addendum opinion.

Following a review of the record, to include the March 2014, September 2015, October 2015, and February 2016 examination reports, the examiner should address the following questions:

(A) Identify all current diagnoses of the right wrist and bilateral knees, to include gout and arthritis. 

(B) Identify all joints where osteoarthritis is present, to include the spine. 

(C) Identify all current diagnoses pertaining to the gastrointestinal system. The examiner should identify all disorders that have been present at any time since March 2010. 

(D) For each diagnosed right wrist, bilateral knee, and spine disorder, and any joint where osteoarthritis is present, the examiner should offer an opinion as to whether such is at least as likely as not (50 percent or higher degree of probability) related to the Veteran's military service, to include wrist difficulties resulting from his service while working on the flight line, a right knee injury in May 1968, prolonged sitting as a result of his military duties, and/or his in-service exposure to herbicides. 

While the examiner is free to cite to studies by the National Institute of Health or any medical treatises in rendering the opinion, the examiner's rationale cannot rely solely on the fact that VA has not included arthritis in the list of presumptive conditions. In other words, the Board needs an opinion as to the likelihood that this Veteran's arthritis, without regard to the conditions VA recognizes as being due to Agent Orange, is nevertheless at least as likely as not related to his exposure to Agent Orange in Vietnam. 

(E) For each joint where osteoarthritis is present, to include the right wrist, bilateral knees, and spine, the examiner should offer an opinion as to whether such is at least as likely as not (50 percent or higher degree of probability) caused by the Veteran's service-connected right foot disorder.

(F) If the Veteran's osteoarthritis of the right wrist, knees, spine, or any other joint was not caused by his service-connected right foot disorder, the examiner should offer an opinion as to whether such is at least as likely as not (50 percent or higher degree of probability) aggravated by the Veteran's service-connected right foot disorder. 

For any aggravation found, the examiner should state, to the best of his/her ability, the baseline of symptomatology and the amount, quantified if possible, of aggravation beyond the baseline symptomatology by the aggravation. 

(G) For each diagnosed gastrointestinal disorder, the examiner should offer an opinion as to whether such is at least as likely as not (50 percent or higher degree of probability) related to the Veteran's military service, to include his in-service gastrointestinal complaints (i.e., September 1965 for pressure in the chest that could be indigestion and November 1969 for diarrhea), and/or his in-service exposure to herbicides. 

Again, while the examiner is free to cite to studies by the National Institute of Health or any medical treatises in rendering the opinion, the examiner's rationale cannot rely solely on the fact that VA has not included gastrointestinal disorders in the list of presumptive conditions. In other words, the Board needs an opinion as to the likelihood that this Veteran's gastrointestinal disorder(s), without regard to the conditions VA recognizes as being due to Agent Orange, is nevertheless at least as likely as not related to his exposure to Agent Orange in Vietnam. 

(H) For each diagnosed gastrointestinal disorder, the examiner should offer an opinion as to whether such is at least as likely as not (50 percent or higher degree of probability) caused by the Veteran's service-connected right foot disorder, to include his use of medication to treat his right foot disorder.

(I) If the Veteran's gastrointestinal disorder was not caused by his service-connected right foot disorder, the examiner should offer an opinion as to whether such is at least as likely as not (50 percent or higher degree of probability) aggravated by the Veteran's service-connected right foot disorder, to include his use of medication to treat his right foot disorder. 

For any aggravation found, the examiner should state, to the best of his/her ability, the baseline of symptomatology and the amount, quantified if possible, of aggravation beyond the baseline symptomatology by the aggravation. 

The examiner must provide a complete rationale for all opinions and conclusions reached.

2. Schedule the Veteran for a VA artery and vein examination with an appropriate medical professional so as to determine the nature and etiology of the Veteran's blood flow restriction disorder. The record and a copy of this Remand must be made available to the examiner. The examiner shall note in the examination report that the record and this remand have been reviewed.

Following a review of the full record, the examiner should offer an opinion on the following questions:

(A) Identify all current diagnoses of blood flow restriction disorders.
 
(B) For each identified disorder of the blood vessels to include ischemia and peripheral vascular disease, the examiner should offer an opinion as to whether such is at least as likely as not (50 percent or higher degree of probability) related to the Veteran's military service to include his in-service exposure to herbicides. 

While the examiner is free to cite to studies by the National Institute of Health or any medical treatises in rendering the opinion, the examiner's rationale cannot rely solely on the fact that VA has not included blood flow restrictions in the list of presumptive conditions. In other words, the Board needs an opinion as to the likelihood that this Veteran's blood flow restriction disorder, without regard to the conditions VA recognizes as being due to Agent Orange, is nevertheless at least as likely as not related to his exposure to Agent Orange in Vietnam. 

(C) For each diagnosed blood flow restriction disorder, the examiner should offer an opinion as to whether such is at least as likely as not (50 percent or higher degree of probability) caused by the Veteran's service-connected CAD.

(D) If the Veteran's blood flow restriction disorder was not caused by his service-connected CAD, the examiner should offer an opinion as to whether such is at least as likely as not (50 percent or higher degree of probability) aggravated by the Veteran's service-connected CAD. 

For any aggravation found, the examiner should state, to the best of his/her ability, the baseline of symptomatology and the amount, quantified if possible, of aggravation beyond the baseline symptomatology by the aggravation. 

In offering any opinion, the examiner must consider the full record, to include the Veteran's lay statements. The rationale for any opinions offered should be provided.

3. After completing the above, and any other development as may be indicated by any response received as a consequence of the actions taken in the preceding paragraphs, the Veteran's claims should be readjudicated based on the entirety of the evidence. If the claims remain denied, the Veteran and his representative should be issued a supplemental statement of the case. An appropriate period of time should be allowed for response.

Thereafter, the case should be returned to the Board for further appellate consideration, if otherwise in order. The Board intimates no opinion as to the outcome of this case. The Veteran need take no action until so informed. The purpose of this REMAND is to ensure compliance with due process considerations.

The Veteran has the right to submit additional evidence and argument on the matters the Board has remanded. Kutscherousky v. West, 12 Vet. App. 369 (1999).

These claims must be afforded expeditious treatment. The law requires that all claims that are remanded by the Board or by the United States Court of Appeals for Veterans Claims for additional development or other appropriate action must be handled in an expeditious manner. See 38 U.S.C.A. §§ 5109B, 7112 (West 2014).

______________________________________________
A. JAEGER
Veterans Law Judge, Board of Veterans' Appeals

Department of Veterans Affairs